THE TEXAS LAND CO. v. FLETCHER WILLIAMS.

1. AUTHENTICATION OF DEED FOR RECORD.—A deed purporting to have been proved for record September 15, 1845, before Samuel Nelson, one of the judges of the Supreme Court of the United States, the certificate not being under the seal of the court of which he was a justice, and his official character not being certified to by the President, and recorded May, 1846, was not duly recorded under the registration laws then in force or under the act of May 12, 1846.

2. ABSENCE OF OFFICIAL SEAL.—The absence of a seal to the officer's certificate of proof of a deed for record, rendered the certificate invalid.

3. SUBSEQUENT LEGISLATION ON DEFECTIVE CERTIFICATE.—An authentication of a deed defective at the time of its record, is not cured by subsequent legislation adopting the form used.

4. EVIDENCE—GRANTEE MAY PROVE HIS DEED.—The grantee in a deed may be called to prove an examined copy of a deed made to him, the original being lost and the subscribing witnesses being dead or out of the State.

5. PRACTICE—IMMATERIAL ERRORS.—The Supreme Court will not revise the action of the District Court, in giving or refusing instructions, unless, when applied to the facts, there is manifest injury to the rights of the party complaining.

6. LIMITATION OF TEN YEARS.—See facts where it was held that the court improperly charged, that if defendant had ten years' actual adverse possession of the land on which he resided before the bringing of the suit, the jury should find that he was entitled to six hundred and forty acres out of the tract sued for.

7. Entry under color of title — Constructive possession.—
Where entry is made upon land under color of title, whether by the
owner in person or by a tenant, the party entering acquires con-
structive possession, if there is no conflicting possession, to the
extent of the boundaries in the title under which he enters.

8. Constructive possession.—The extension of this constructive
possession to such limits only, depends on the question whether it is
*bona fide* and under such a color of right, so that other parties can
ascertain its character and extent.

9. Construction of lease.—A writ of possession for a tract of eleven
leagues of land was executed against numerous defendants holding
small locations or settlements on the grant. On the execution of
the writ, each defendant took a lease for "the premises," covenant-
ing to keep the improvements up and against waste: *Held,* That
such leases, and the possession held by the tenants under them, did
not necessarily extend to the limits of the grant for which the writ
was issued; and that such leases would naturally include the prem-
ises occupied by each, and as to which the writ was enforced.

10. Writ of possession affects parties and privies.—The ex-
ecution of a writ of possession against parties bound by the judg-
ment under which it issued, in no way affects the right of a party
in possession of another part of the grant sued for, and not bound
by the judgment, when such party had title to his land by limita-
tion.

11. Possession was taken and held under a location of a certificate
for six hundred and forty acres; after a possession of more than ten
years, the certificate was lifted; part of the land covered by the
location was without the boundaries of the tract sued for: *Held,*
Error in a verdict for six hundred and forty acres out of the land
sued for. The title by limitation included the lands actually occu-
pied by the first entry.

Appeal from Leon. Tried below before the Hon. John
B. Rector.

The Texas Land Company, an incorporated company under
the laws of Texas, with power to buy, hold, and sell lands,
brought this suit October 6, 1874, in the District Court of
Leon county, against Fletcher Williams, to recover posses-
sion of the Grande eleven leagues of land situated in Robert-
son and Leon counties, setting out the boundaries of the
eleven leagues and claiming title to and possession of the
same. It is alleged that on February 27, 1872, defendant

entered and dispossessed plaintiff. The petition is in the usual form or trespass to try title.

Williams pleaded not guilty and the statute of limitation of ten years, in which he claimed six hundred and forty acres of the land sued for, to include his improvements, by right of his ten years' adverse possession.

The defendant also prayed for decree quieting his title to the same, describing in his answer the six hundred and forty acres claimed by him by metes and bounds.

The verdict was rendered for defendant, and that he was entitled to the six hundred and forty acres of land, including his improvements.

The judgment was rendered according to the finding of the jury, and the county surveyor and two other persons were appointed by the court to set apart to the defendant "the said six hundred and forty acres of land aforesaid."

The plaintiff's motion for new trial being overruled, he appealed.

Plaintiff below offered in evidence and read to the jury, over objections of defendant, as shown by bills of exception, a complete chain of title from the States of Coahuila and Texas down to plaintiff, excepting a deed from James Fortune to Ashbel Smith, which should constitute a link in said chain of title.

Plaintiff offered explanatory evidence in connection with said muniments of title.

The copy of this deed was ruled out as not properly authenticated for record. This deed from Fortune to Smith was witnessed by Jesse F. Randall, B. F. Archer, Benjamin D. Silliman, and authenticated for record in due form on the 15th of September, 1845, by the oath of B. D. Silliman, in the State, city, and county of New York, before Samuel Nelson, one of the justices of the Supreme Court of the United States, and certified to by said justice signing his name (Samuel Nelson) thereto, without a seal thereto or in connection therewith.

Ashbel Smith testified that he had this deed recorded in old Franklin, the county-seat of Robertson county, in May, 1846, and said, "I at the time collated the deed with the record. The copy which is now shown me, I believe to be accurately a copy of the Fortune deed to me."

Said copy, being a copy from the records of Robertson county, was offered as a recorded instrument under the testimony of Ashbel Smith, which was excluded from the jury on the exception of the defendant that it was not properly authenticated for record; to which ruling plaintiff excepted.

The copy was then offered as an examined copy of the original in connection with the testimony of the witness Ashbel Smith. It was shown that two of the witnesses to the deed were dead, and that the other resided without the State. Witness Smith testified, in addition to that already given, that he saw Fortune sign and execute the deed, and that he saw the witnesses sign at request of Fortune; "that the copy now shown me, I believe, is accurately a copy of the Fortune deed to me. That deed is the same as the copy now shown me. The record of the deed in Robertson county I know. The copy now in court I know is a copy of the original."

The copy was excluded; to which plaintiff excepted.

Under the allegation of possession of said land sued for, plaintiff insisted that the possession of Edward McMillan, John P. Powell, Hui Lochamy, and others holding under leases and occupying as tenants of H. G. Smith the Grande eleven-league tract from 1850, and the record of a deed for the grant from Ashbel Smith to H. G. Smith on June 18, 1852, coupled with payment of taxes, constituted a valid title in H. G. Smith in 1857 to the entire Grande tract not in actual possession by parties holding adversely.

The testimony was, substantially, that said leases were all dated in August, 1850, and the several tenants agreed to hold at the pleasure of Henry G. Smith, and each lease was for the premises described in a writ of possession then in the hands

of David Ayres, deputy United States marshal. The tenants paid no rent, but agreed to preserve the premises from waste and to hold at the pleasure of Henry G. Smith.

G. II. Love, for plaintiff, testified, by deposition, that in 1850 he acted as attorney in fact and agent for H. G. Smith, and took the leases of McMillan and the other tenants on the Grande eleven leagues, to hold during the pleasure of Henry G. Smith, and did not remember the amount of land leased to each tenant. Love says: "I recognize the leases shown me as being those executed by Lochamy, McMillan, and others 'for their leases on the Grande eleven leagues."

David Ayres, for plaintiff, testified, by deposition, that he, as deputy United States marshal, went on the Grande eleven leagues with a writ of possession issued from the United States District Court at Galveston in favor of Henry G. Smith. "The writ authorized me to put H. G. Smith in possession of the entire Grande eleven leagues. G. II. Love accompanied me as attorney in fact for H. G. Smith, and rented to McMillan the piece or tract of land he had improved."

There were various persons occupying small tracts on the Grande eleven leagues, and Smith's attorney leased to them their residences and improvements in the same manner as he did to McMillan. The writ of possession was returned to the court, and was destroyed by fire at Houston during the war.

The leases were all recorded in Robertson county in 1852.

In 1850, Henry G. Smith was claiming the legal title to the Grande eleven leagues under a deed from Ashbel Smith dated April 23, 1849, which deed was recorded in Robertson county June 18, 1852.

In 1871, H. G. Smith reconveyed to Ashbel Smith.

Ashbel Smith, for plaintiff, testified that he paid all taxes due on the land from 1845 to 1871, when he sold to Spofford. He says that from 1846 to 1871 some one was holding possession continuously, for him or for H. G. Smith, of the Grande eleven leagues.

October 21, 1850, H. G. Smith executed to Ashbel Smith a power of attorney to control and manage and sell the Grande eleven leagues.

Defendant proved that the place now occupied by defendant Fletcher Williams was settled by T. Moore in 1844 or 1846; that he (Moore) located his headright certificate for six hundred and forty acres on it, about four hundred acres of which was on the Grande and the balance on the Viesca grant. The dwelling-house and the farm first put in, were on the Grande. Moore died in 1848; Williams married his widow in 1850, and has lived on the place ever since, and has always to the present time rendered the six hundred and forty acres as the T. Moore survey, for taxes. Williams has never held as tenant under any one, but has always claimed in his own right from the time of his marriage, in 1850. The Moore certificate was floated by the heirs of Moore before the war.

Fletcher Williams, the defendant, testified that the place he now lives on was settled by T. Moore in 1844. "Moore located his headright certificate for six hundred and forty acres, partly on the Grande and partly on the Viesca grant. After my marriage with Moore's widow, in 1850, I have continuously resided on the land and claimed it as my own. Moore's heirs lifted the certificate before the war. About fifteen acres of my farm are off the Grande and on the Viesca eleven leagues. The land he (Williams) claims is on the Grande. Williams has paid taxes on the land every year since he occupied it."

It was admitted that Williams had rendered it for taxes as the T. Moore survey down to the present time. Williams said he had, from 1850, claimed in his own right by possession.

On cross-examination witness said: "When I listed the land for taxes in 1850 and 1855, I intended to list the land covered by the T. Moore field-notes; do not know whether I intended to list the same in 1870 or not; the bigger portion of the Moore survey is on the Grande eleven leagues."

Fletcher Williams also testified, that about 1850 Ashbel Smith was at his (Williams') house, and offered to compromise with him for $40.

The writ of possession executed by Ayres, United States deputy marshal, did not affect the possession of defendant or of those under whom he claimed.

The opinion shows sufficiently the other facts.

*H. D. Prendergast, W. E. Collard,* and *W. M. Johnson,* for appellant.

I. The court erred in excluding from the jury the deed from Fortune to Ashbel Smith as an instrument not properly recorded and as an examined copy. (Hartley's Dig., art. 2794; Butler *v.* Dunagan, 19 Tex., 565; Rule 30, Sup. Ct.)

II. As to possession, the court erred in its charge. The jury were charged that "one who makes entry on land by a tenant only acquires possession of the land to the extent and boundaries of the land cleared," and that "the written leases executed by McMillan and others to H. G. Smith, in 1850, are not conclusive as to the amount of land leased by said tenants." (Ledyard *v.* Brown, 27 Tex., 405; Sutton *v.* Carrabajal, 26 Tex., 500; 1 Wash., pp. 47, 48; Ang. on Lim., secs. 395–400, 410; Tyler on Eject., 117.)

*W. D. Wood* and *A. H. Weir,* for appellee, cited and discussed 1 Greenl. Ev., secs. 141–144, 514, 558; Stroud *v.* Springfield, 28 Tex., 649; Roe *v.* Neale, Dudley, (Ga.,) 168; Green *v.* Chelsea, 24 Pick., 71; Word *v.* McKinney, 25 Tex., 268; Paschal *v.* Perez, 7 Tex., 362; Hill *v.* McDermott, Dallam, 419; Andrews *v.* Hoxie, 5 Tex., 183; Story's Const. Law, secs. 586, 634, 641; Leland *v.* Wilson, 34 Tex., 91; Jackson *v.* Roberts, 11 Wend., 425; Allen *v.* Smith, 1 Leigh, 231; Williams *v.* Peyton, 4 Wheaton, 77; Jackson *v.* Pratt, 10 Johns., 381; Stinnett *v.* Rice, 36 Tex., 106; Reagan *v.* Holliman, 34 Tex., 403; Bateman *v.* Bateman, 16 Tex., 544; Dunn *v.* Choate, 4 Tex., 18; Nixon *v.* Armstrong, 38 Tex.,

301; Robertson v. Teal, 9 Tex., 348; Charle v. Saffold, 13 Tex., 94; Whitehead v. Foley, 28 Tex., 268.)

MOORE, CHIEF JUSTICE.—The first ground for which it is insisted this judgment should be reversed, is alleged error of the court " in excluding from the jury the deed from James Fortune to Ashbel Smith as an instrument not properly authenticated for record." It would be inferred from this assignment that appellant offered in evidence a deed such as he describes; but, in point of fact, there was no such deed offered in evidence or excluded by the court. The instrument excluded, and to which this assignment refers, was, if the transcript is correct, an uncertified copy of an instrument purporting to be a deed from Fortune to Smith, claimed by appellant to be duly recorded in the office of the clerk of the County Court of Robertson county, where the land, or a portion of it, was situated at the date of its record. The omission of the clerk's certificate from the transcript would fully justify us in not considering the question presented by this assignment. But as it may be inferred from the record that its absence is owing to an oversight in the preparation of the transcript, and as it may tend to a settlement of this litigation, or its determination upon its real merits, we deem it admissible to consider and determine the objection made to the copy of the deed in the court below, and upon which it seems to have been excluded from the jury, viz.: That the deed, as it appeared from the copy, had not been properly authenticated for record, and hence the copy is of no validity. (Paschal's Dig., art. 3716.)

The execution of the deed purports to have been acknowledged by the grantor on the 15th day of September, 1845, before Samuel Nelson, one of the justices of the Supreme Court of the United States; but the certificate of this fact made and attached to the deed by Nelson was not authenticated by the seal of the court of which he purports to be a member; nor was his official character certified to by the

President of the United States, as required by the law in force when the execution of this deed was acknowledged. (Hart. Dig., art. 2777.) The deed, though acknowledged September 15, 1845, was not recorded until some time in May, 1846; and it is therefore urged that it must be regarded as properly recorded, because the certificate, though previously made, it is said, conforms to the requirements of the act of May 12, 1846, "to provide for the registry of deeds and other instruments of writing." (Butler *v*. Dunagan, 19 Tex., 565.) But if the certificate upon which the deed was recorded was in strict conformity with this law, as the act did not go into effect until the second Monday in July, 1846, more than a month after the deed was recorded, it would in no way help appellant's case. Nor would appellant be in any better condition if his record had to be tested by the act of May 12, 1846. The eleventh section of this act, after enumerating the different officers by whom deeds may be authenticated,—first, in the State; second, without the State and within the United States and their Territories; third, without the United States, — reads: "And in all cases the certificate of such acknowledgment or proof shall be attested under the official seal of the officer taking the same." (Hart. Dig., art. 2794.)

2. The copy of the deed from Fortune to Smith, in connection with Smith's testimony, was, we think, admissible in evidence as an examined copy of the original deed.

In the case of Wiggins *v*. Fleishel, 50 Tex., 57, we held that the grantee in a deed could not be called to prove its execution without accounting for the absence of the subscribing witnesses, or otherwise laying the foundation for the introduction of secondary evidence. In this case, the deed of which a copy is sought to be given in evidence, is shown to be lost. Secondary evidence of its execution and contents was therefore admissible. As there are no degrees in secondary evidence, we can perceive no reason why the grantee is not as competent a witness to testify in regard to it as any

one else.  If an objection can be urged against his evidence, it must be as to its credibility, and not to its admissibility.

The existence and execution of the deed was shown, when executed, to have passed directly from the grantor to Smith, the grantee, and seems to have been in his possession and control from that date, which was more than thirty years before the trial of this case, until he placed it in the hands of Allen and Hale, his attorneys, who brought suit upon it and the other papers constituting the then claimant's (Henry G. Smith's) chain of title some twenty-five years before the trial of this case, since which time many persons have held continuous and uninterrupted possession of the land under the title of which this deed forms a link.  Though not legally authenticated for record, the grantee had, in fact, caused it to be recorded, in less than a year from its date, in the county in which the land was then situated.  The only one of the subscribing witnesses living at the trial of the case was proved to be a non-resident of the State.  This, of itself, would have warranted a resort to secondary evidence, if the deed had been before the court and it had been essential to establish its execution by direct testimony.  (1 Greenleaf on Evidence.)  The witness Smith testifies that he had the deed recorded in Robertson county in 1846, and at the time "collated the deed with the record."  He also says: "The copy which is now shown to me, I believe is accurately a copy of the Fortune deed to me.  That deed is the same as the copy now shown to me.  The record of the deed in Robertson county I know.  The copy now in court I know is a copy of the original."

3. The third assignment of error is, that the court erred in giving to the jury the first, third, and fourth charges asked by the defendant.  The proposition urged by appellant for the reversal of the judgment, under this assignment of error, is to the effect that the possession of the land by Henry G. Smith, through tenants, for five years from the 18th of June, 1852, the date at which Smith was placed in possession by

the marshal, coupled with the payment of taxes, constitute a perfect title in said Smith at the end of five years from said date. The charges assigned as error evidently do not negative this proposition. As to this assignment of error, the proposition presents merely an abstract question for our consideration, which we are not called upon to decide. Nor are we, strictly speaking, called upon to consider whether the charges assigned as error are correct, as we are not asked by appellant in his brief to reverse the judgment on account of the instructions therein given to the jury by the court, but on an assumption of a state of facts which, in our opinion, is not borne out by the record. Nevertheless, as there is error in one of the charges complained of, we deem it appropriate, to a proper determination of the case, to make some comment upon them.

In the first of these charges the jury are instructed: "If plaintiff only had possession by tenants, and each of said tenants had possession of a separate and distinct portion of the eleven-league grant sued for by plaintiff, such partial possession does not constitute actual possession of the whole grant, but is confined to the portion of the land leased or occupied. And if defendant had ten years' actual adverse possession of the land on which he resided, before the bringing of the suit, the jury should find that he is entitled to six hundred and forty acres of said eleven leagues." Now, the first part of this charge is undoubtedly correct. The latter portion, however, is objectionable on account of its vagueness, if for no other reason. But if we are to understand it as holding that defendant is shown to have held actual and exclusive adverse possession of six hundred and forty acres of the land for ten years, and that the leases under which the tenants of plaintiff held do not extend to or embrace any part of the six hundred and forty acres thus adversely held by the defendant, the charge is unobjectionable; otherwise, it is not.

In the third of these charges, given at the request of de-

fendant, the jury are told that a party "who makes entry on land by a tenant only acquires possession to the extent and boundaries of the land cleared." This instruction is palpably erroneous. Without undertaking to say that there are no limitations or exceptions to it, it is unquestionably a well-established general rule, that where entry is made upon land under color of title, whether by the owner in person or by a tenant, the party entering acquires constructive possession, if there is no conflicting possession, to the extent of the boundaries in the title under which he enters. The extent of possession acquired by entry does not depend upon the character of title, whether it is in fee or for a term of years, or whether it is absolute or in trust for some one else, but whether it is *bona fide* and under such color of right as that other parties can ascertain its character and extent. The charge here in question seems to have been inadvertently given by the court, as it is in conflict with instructions which had been previously given at the request of appellant.

The fourth charge complained of by appellant, is to the effect that the leases to the several parties holding under his title were not conclusive as to the amount of land included in them, or intended to be thereby leased. There is nothing, we think, in this charge of which appellant can complain. The leases do not indicate in direct and positive terms the quantity of land leased. Appellant insists that the quantity of land leased is shown by the writ of possession, under which the possession of the land had just been surrendered by the tenants to the lessor, Smith. But we do not think, although Smith had recovered judgment for the entire eleven leagues of land, that the leases given by him to parties against whom he had recovered, who accepted leases from and subsequently held under him, were for the entire grant. The terms of the leases do not require such conclusion. Though the writ of possession entitles Smith to possession, as against the defendants in the action, of all the land described in the writ, evidently all that each defendant could surrender or be

dispossessed of under the writ was only such part of the tract as he was then occupying and holding. Appellant's testimony shows that the parties to whom leases were given by Smith were mere squatters on the land, occupying small improvements, or holding small portions of the tract by the location of their headright or other certificates. There was no doubt that it was the "premises" thus surrendered and yielded possession of, in obedience to the writ of possession, which was leased to them. And so the witness Ashbel Smith, (himself the real, though not nominal plaintiff in the judgment,) as well as Ayres, who executed the writ of possession, state. It would be unreasonable to give these leases any other construction. Each tenant, in consideration of the lease to him, bound himself to preserve the premises leased him from waste and injury. Certainly it cannot be supposed that each of these intended to become surety for all the others, or to covenant against waste to the extent of the entire eleven leagues of land.

4. By its fourth charge, the court instructed the jury that a lease by plaintiff's vendor (Smith) to a tenant of a part of the eleven leagues claimed by plaintiff, would not stop the running of the statute of limitations in favor of the defendant. The correctness or incorrectness of a charge depends upon the facts to which it is to be applied. Supposing the part of the land leased by Smith did not conflict with that claimed or held by defendant, the charge is no doubt correct; and from what has been said in respect to the leases given by Smith, it cannot be inferred that they in fact conflicted with that claimed or occupied by the defendant. Defendant was not a party to the suit brought by Smith in the United States court. The writ of possession did not authorize the marshal to dispossess defendant of the land held by him. The parties against whom the writ issued were not in possession of that part of the land, and they certainly could not yield possession of it in obedience to the writ; and, therefore, even on appellant's construction, it was not included in the lease. The evidence

clearly shows, and it is not attempted to be controverted, that the defendant and those in right of whom he entered upon the land had been in exclusive, uninterrupted possession, holding under a valid headright certificate, for more than twice the length of time necessary to complete the bar of limitation against Smith at the date of his judgment in the United States court, in 1852. If it is admitted that Smith, by the entry of his tenant, acquired constructive possession, still, as the title under which defendant was then holding was the better title to the land included in the Moore survey, the constructive possession of it must be held to have been in defendant.

5. The defendant got possession of the land surveyed for Moore, and to which he had a valid title by limitation before his death. By his marriage with Moore's widow, he must be regarded as holding it in her right, and that of the heirs of Moore, at least until the certificate was floated. Prior to that time, there can be no pretense that he held or claimed any other land than that included in this survey; and if it was admitted that subsequently to the lifting of this certificate defendant claimed six hundred and forty acres of land on the Grande eleven leagues, and could have made good his claim to that quantity of land under the seventeenth section of the statute of limitations, the evidence does not show that he had possession of it for a sufficient length of time to complete the bar of the statute. In fact, his own testimony is to the contrary. The verdict of the jury giving him six hundred and forty acres, though only about four hundred acres of the Moore survey was on the Grande eleven leagues, was unsupported by evidence, and should have been set aside. Defendant's answer put in issue plaintiff's title to the entire grant. A verdict should have been rendered against him for all that part of the grant not included in the Moore survey.

The judgment is reversed and the cause remanded.

Reversed and remanded.