W. R. PURYEAR v. JOHN FRIERY.

Decided November 25, 1896—May 5, 1897.

1. **Limitation—Constructive Possession—Tenant of Part.**

Defendant having color of title, by a regular chain of conveyances, to the land in controversy (plaintiff being an innocent purchaser from heirs of a patentee, whose deed, a link in defendant's title, was unrecorded), had no inclosure or improvements thereon, except a garden and dwelling house, rented to a tenant and so occupied for three years before suit. In connection with incidental use of the uninclosed portion for grazing purposes (for particulars of which see opinion), such tenant's occupancy gave the defendant possession to the limits of his deed. (Following Bowles v. Brice, 66 Texas, 724).

2. **Same—Possession of Part by Tenant.**

In the opinion of Justice Key, there should be no distinction between actual possession of part by the claimant himself and that by his tenant, but both should be held to extend by construction to the limits of claimant's deed, though a sale by the claimant of the part in his actual possession would terminate his constructive possession of the remainder.

APPEAL from Hays. Tried below before Hon. H. TEICHMUELLER.

*Wheeless & Harris*, for appellant.—1. The court erred in refusing to allow the defendant to prove the nature and value of the improvements he had placed upon the land in controversy in good faith; and erred in refusing to allow defendant to prove by his vendor, Wolf, the amount he, Wolf, paid in cash for the land in controversy.

2. The same presumptions should prevail in favor of the ancient record of a deed as to its authentication for registration that obtain as to its execution.

3. A deed executed in 1838, being signed by the vendor in the presence of two subscribing witnesses and a notary public, all of whom sign

their names officially thereto, and which was in fact recorded in 1846, in the county in which the land conveyed therein was then situated, should be held constructive notice of its existence and contents in 1884. Rev. Stats., art. 4356; "Healing" Acts constructions: 28 S. W. Rep., 691; 77 Texas, 342; 57 Texas, 3, 6; 81 Texas, 119; 65 Texas, 448; 58 Texas, 115; 65 Texas, 457; 59 Texas, 223; 23 Texas, 429; 19 Texas, 565; 18 Texas, 151; 2 Posey's U. C., 614; 126 Texas, 188; 23 Texas, 479, 480.

4. The court erred in holding that plaintiff is an innocent purchaser of the land in controversy for valuable consideration paid therefor in good faith.

5. The court erred in concluding, as a matter of law, that plaintiff is not barred by limitation from recovering seventeen-thirtieths of the land in controversy. Defendant acquired the land in 1884, under a perfect chain of title, all of which, including the deed to himself, has been properly of record since 1884; and he has paid all taxes ever since 1884. The court holds that plaintiff is entitled to recover seventeen-thirtieths of this land as an innocent purchaser from a portion of the heirs of the original grantee in 1884, after defendant had acquired it. Plaintiff sued defendant for this land in 1886, alleging that defendant was in actual possession of it, holding it adversely to him, but allowed the suit to be dismissed in 1887, under rule for costs. After suit was dismissed, defendant built a house on the land and fenced in a garden in 1887, and placed in said house, as soon as it was completed, his son-in-law, who has lived in said house and cultivated the garden ever since, as defendant's tenant, being all the while employed by defendant. Furthermore, during all this period defendant kept all stock not his own driven off of this land, and begun preparations for fencing it as early as 1887 or 1888, by purchasing, and placing thereon posts and wire for fencing material. He lived all this time on a tract, also owned by him, joining this tract, on which he had three fields under separate inclosures, two of which were separated by a lane, and one of these and a third field, by a gap about a half mile wide. In the spring of 1890, or 1891, defendant placed a continuous fence around and upon three sides of this land, which fence connected with the inclosures around two of his said fields, respectively, between which was the gap. This gap defendant closed by a fence in the spring of 1892. The fencing was done from time to time, as defendant was able to bear the expense, and was under construction, part at a time, for a considerable length of time before all the land was completely inclosed by a continuous fence, in the spring of 1892. This suit was filed May 14, 1894. There is no dispute about these facts. The court substantially finds them so; and under them the plaintiff is clearly barred by limitation from recovering any part of this land. The court erred in holding a contrary view; and judgment should have been rendered that plaintiff take nothing by his suit, and pay all costs. Richards v. Smith, 67 Texas, 612; Bowles v. Brice, 66 Texas, 730; Moore v. McCown, 20 S. W. Rep., 1112; Gunter v. Meade, 78 Texas, 639. [This was appellants' eighth assignment of error.]

*Will G. Barber,* for appellee.—1.   In an action which seeks simply to establish the title of one cotenant in land as against another cotenant, the value or nature of improvements made by the latter are wholly immaterial, and can in no way affect the judgment to be rendered.

2.   Lapse of time creates no presumption that a deed was properly acknowledged for record, where the record fails to show it.   Hill v. Taylor, 77 Texas, 295.

3.   A deed bearing in no part thereof any certificate of acknowledgment, although recorded, is not constructive notice; and a deed signed by attesting witnesses and a notary public is not acknowledged.   Peters v. Clements, 46 Texas, 114; Craddock v. Merrill, 2 Texas, 494; Holliday v. Cromwell, 26 Texas, 189; Wood v. Welder, 42 Texas, 396; Flemming v. Reed, 37 Texas, 152.

4.   Appellee objects to the consideration of appellant's eighth assignment.   (1).  Because it is not followed by any proposition, nor is it in the shape of a proposition to be maintained.   It embodies a statement of all the facts relied upon by appellant to support his contention (and an incorrect statement at that).   This statement should follow the assignment and not be embraced therein.   Wilson v. Alexander, 18 S. W. Rep., 1057.  (2).  Because it is not followed by any statement, such as is required by the rules.   "To give title by limitation there must be an adverse claim and exclusive occupation, or possession, of the thing for the length of time and under the circumstances prescribed by the statute."   Richards v. Smith, 67 Texas, 610; Ward v. Cochran, 150 U. S., 597; Murphy v. Welder, 58 Texas, 235; Pendleton v. Snyder, 24 S. W. Rep., 363; Brymer v. Taylor, 23 S. W. Rep., 635; Mason v. Stapper, 8 S. W. Rep., 598.

5.   Where the only improvement on a 640-acre tract of timbered pasture land is a house and garden spot near the line, occupancy of such house and garden spot by a tenant whose rights are limited thereto does not put the landlord in possession of the remainder so as to support limitation.   Land Co. v. Williams, 51 Texas, 61; Read v. Allen, 63 Texas, 154; Craig v. Cartwright, 65 Texas, 413; Cunningham v. Frandtzen, 26 Texas, 38.

KEY, Associate Justice.—This suit was brought by appellee in form of trespass to try title.   The court below held that the defendant had limitation as to that portion of the land upon which he had built a house and garden, and that the plaintiff was entitled to recover seventeen-thirtieths of the remainder.

The trial judge filed the following conclusions of fact and law:

*Fact.*—"1.   Patent granting the land in controversy to David G. Williamson, dated December 6, 1845.

"2.   Conveyance of the land by David G. Williamson to Robert H. Wynne, dated October 18, 1838, filed for record in Hays County March 15, 1887.

"3.   Deed from Robert H. Wynne to Frederick Schmidt, August 8, 1846, recorded in Hays County March 1, 1887.

"4.   Certified copy of partition in 1881, in which the land in controversy was allotted to Ch. Schmidt and B. Schmidt.

"5.   Deed of Ch. Schmidt and B. Schmidt to Chas. Wolf, 26th of June, 1883.

"6.   Deed of Chas. Wolf to W. R. Puryear, 16th of April, 1884.

"7.   Deed of Ann Williamson and of Phebe S. Evans, joined by her husband, George W. Evans, to John Friery, conveying the land in controversy, 27th October, 1884, filed for record in Hays County 10th December, 1884 .

"8.   David G. Williamson died in 1850, leaving surviving him his widow, Ann Williamson, who died in 1886; his daughter, Phebe S. Williamson, now Mrs. Evans, and still living; Albert H. Williamson, who died in 1851; and James D. Williamson, who died in 1871, leaving wife and child as his heirs.   Mrs. Callahan was the only child of Mrs. Williamson's first marriage at death of Albert H. Williamson.

"9.   In 1887 W. R. Puryear put a house on the premises and inclosed a small patch for garden purposes, which have been occupied by his son-in-law ever since.   Puryear put posts around the tract and bought wire, from time to time, with the view of fencing the land, but he never actually inclosed it until some time in the spring of 1892.   Puryear never did live on the land in controversy, but resided on an adjacent tract of land, and the land in controversy was not wholly inclosed for pasturing purposes until the spring of 1892.

"10.   Plaintiff had no actual nor constructive notice of the conveyances from Williamson to Wynne and from Wynne to Schmidt.

*Conclusions of Law.*—"1.   The evidence shows a perfect chain of title to the defendant, Puryear, but since the plaintiff, Friery, purchased from the widow and daughter of the original grantee, without actual or constructive notice of the sale by the latter during his lifetime, the plaintiff acquired title by his purchase to so much of the land as Mrs. Williamson and Mrs. Evans were entitled to as heirs of David G. Williamson, and of the children dying subsequently.

"2.   Limitation did not commence running in favor of defendant until the spring of 1892, and limitation is therefore no protection to him, except as to the house and inclosed garden patch.

"3.   Puryear is entitled to the house and inclosed garden and to an undivided interest of thirteen-thirtieths of the remainder of the tract, and plaintiff is entitled to an undivided interest of seventeen-thirtieths of the land."

*Opinion.*—Appellee objects to the manner in which appellant has presented the case in his brief, and there is merit in some of the objections. However, we have considered all the questions we understand appellant to rely upon for a reversal, and conclude that no ground for reversal is shown.

Having only established the plaintiff's title to an undivided interest, but

little in excess of half of the land, there was no error in not considering the question of the defendant's improvements.

The record does not show that the defendant offered to prove by Wolf that he paid $800 for the land, as stated in appellant's brief. It shows that the defendant offered to so testify, himself, and was not allowed to do so; but there is no assignment of error complaining of that ruling.

There is evidence supporting the finding of the court that appellee was an innocent purchaser for value, as well as the other findings; and, the facts being as found, the judgment is correct, and it will be affirmed.

<em>Affirmed.</em>

OPINION ON MOTION FOR REHEARING.

KEY, Associate Justice.—Upon a careful reconsideration of this case on motion for rehearing, we have concluded that we erred in affirming the judgment, and that appellant's eighth assignment points out reversible error.

Appellee objects in his brief and in reply to the motion under consideration to this assignment's being considered.

While amended rule 30 may not have been strictly complied with, we have had no difficulty in ascertaining the question sought to be presented. No motion was made to strike out appellant's brief because of noncompliance with the rule. We considered the assignment in deciding the case, and we do not think it would be proper at this time to disregard it.

The assignment in question challenges the correctness of the trial court's second conclusion of law, holding that limitation did not commence running in favor of defendant until the spring of 1892, except as to the house and inclosed garden.

Appellant was defendant in the court below, and among other defenses pleaded the three years statute of limitation. He showed a regular chain of title from the State down to himself, the last deed—the one from Charles Wolf to appellant—being duly recorded April 16, 1884. Plaintiff claimed under a deed from the surviving wife and heirs of David G. Williamson, the patentee, executed October 27, 1884. At the time the plaintiff bought, the deed from the patentee under which the defendant claims was not recorded in Hays County—where the land is situated—and the court below, on testimony tending to support the finding, held that plaintiff was an innocent purchaser.

It will be seen from this statement that the defendant showed color of title to the land; and if the testimony bearing upon the subject shows without conflict that he had three years' continuous adverse possession prior to the beginning of this suit, judgment should have gone for him for the entire tract.

The suit was filed May 25, 1894. It was shown by uncontroverted testimony that appellant and those under whom he claims had paid taxes on the land from 1879 to 1894, inclusive; that on the 13th day of February, 1886, appellee brought suit against appellant to recover the land

in suit, and alleged in his petition that appellant had dispossessed him of the land; and that on the 15th day of March, 1887, said suit was dismissed under rule for costs.

The balance of the testimony upon the subject of limitation is as follows:

"W. R. Puryear, defendant, testified: I bought the land in controversy from Chas. Wolf, of Austin, Texas, in 1884, and never heard of any claim adverse to mine until cited to answer Friery's first suit against me for the land, in 1886, and when that ended I thought it settled forever. I got all my title papers now in evidence from Wolf. After that suit was dropped I began improving the land; hauled some cedar posts and piled upon the land; built a small house out of pine lumber, as described in my answer herein, on the land in 1887, and put in a garden on it near the house along about that time; think I put the wire on early in 1888. The house has been occupied all the time since it was built by Sam Robinson, who is my son-in-law. He helped me to build the house, and as soon as it was built he moved into it. He lived there some time before he married my daughter. He worked for me about two years before marrying. He has also had the use of the garden, which is a small inclosure near the house. I lived on land owned by me joining the land in controversy on the north side of it before I bought it, and my house I live in is on that land, and not the Williamson. I had three separate fields on my old place when I bought the land from Wolf. I never lived on the land in controversy myself, but Sam Robinson has lived in the house as my tenant all the time since about the time I built the house. I bought wire from time to time as I had the money to spare to fence all the land, and built the fence part at a time. I never finished all the fencing so as to wholly inclose all the land by fence until the spring of 1892. Here is a rough plat showing how the land lies, etc., as it now is:

"In fencing I began at southwest corner of my old field at point marked 'b' and fenced along down the west line to 'd,' thence to 'e,' and on around by 'f' to 'g.' This fencing was completed about one and a half years before I closed it all up by building from 'a' to 'j' and thence to 'i.' This latter fencing inclosed all my land, the Williamson tract and my old

home place. It was closed in the spring of 1892, according to my best recollection. Before we closed it up, as stated, we watched the two gaps between my farms (A) and (B) and (B) and (C), and kept my stock from going through these gaps and all other stock outside off of all my land, including the Williamson survey. We kept my stock herded on my land and all other stock run off before I began putting up the fences 'a' to 'j' and 'j' to 'i.' The fencing around all of the land is four strands of barbed wire and cedar posts. There is a line of cedar posts now along the northern portion of the Williamson, as shown by the dotted line 'k' .... 'l,' which I set for the purpose of putting up a partition fence, but I never put the wire on them. I set them there in 1890, or maybe 1889. I bought the wire I used in fencing in Austin. The first wire I used was on the garden on this land, and next was used on the fencing around west, south, and east sides of the Williamson tract.

"Cross-examined by plaintiff: The only portion of the Williamson survey that I ever rented to Sam Robinson was the house and the garden spot. I did not at any time rent him any of the remainder, and he had nothing to do with it. I had entire control of the remainder. The first place we began fencing on the Williamson was along the line 'c' 'd,' the west line. This was before any posts were put in on the dotted partition line 'k' 'l.' All of this fencing was done along at odd times. We did not begin and continue working until we finished, but would work along a day or so at a time when I could spare the time. We first dug holes and set some posts along the west string, and worked on around the south and east sides. We put all of the posts up before stringing any wire. I remember when J. H. McNutt, the county surveyor of this county, was surveying some land close to me for Cal Roy, and ran around the Williamson survey. I had not then commenced digging holes or setting posts on or around any part of the Williamson except the garden. It was about two years after McNutt did the surveying before I began digging the first holes along said west string to set posts for the purpose of fencing on around the Williamson survey, along the lines 'c' 'd,' 'd' 'e,' and 'e' 'f.' It may not have been over one year and a half, but I think it was about two years. The Williamson tract is one mile square. I built the house Robinson lives in twenty-five or thirty steps from the line. My old house was about one-half mile from the new one built on the Williamson. It is about one and one-half miles from my house to the south line of the Williamson survey. The gap between fields (B) and (C) is from one-half to three-quarters of a mile wide—probably about one-half. I kept no one employed specially to guard this land, but Robinson, my boys, and myself watched it in passing, and kept my stock on and the others off the best we could. Of course outside stock would get on the land occasionally. No one stayed up of a night to watch the land. My instructions to Robinson and my boys were to keep my stock on the land and others off. I told sheep-herders to keep off the land, and would drive them off when I saw them. We tried to guard the land even before putting up any fencing, and continued to do so after the gaps between my

fields were the only passages left open. The land is timbered, brushy mountain land, chiefly useful for grazing. Robinson has lived in the house as my tenant ever since it was built, and has worked for me.

"Sam Robinson testified for defendant: I am defendant's son-in-law. I married in the fall of 1889. I hauled the lumber to build the house on the land in controversy, and helped build it. It was built some time before I was married, and I lived in it before, and have ever since. I was working for defendant. I have occupied the house as tenant of defendant. I also had the garden and used it. Puryear allowed me to turn my horses in the pasture with his, and before the land was fenced I kept them with his, too. They all grazed upon the land. The defendant instructed me to keep our stock herded on the land and to keep off other stock and sheep-herders. I drove them off frequently. After building the fence around the lines 'b,' 'c,' 'd,' 'e,' 'f,' and 'g' there was a gap between the two fields (B) and (C) where stock could pass in and out, and also between the fields (A) and (B) along the lane, which was about thirty steps wide, where the road runs. We watched these gaps and kept Puryear's stock inside and the other stock out. This gap—the larger one—was from one-half to three-fourths of a mile wide. I don't think we began work on the first pasture fencing until the spring of 1891. May have been setting posts in the winter of 1890. The garden was fenced, I think, in 1888. (Witness described position of houses, fields, and fences as shown in the plat set out in Puryear's testimony.)

"Cross-examined by plaintiff: The only portion of the Williamson survey I ever rented was the garden spot and the house. I did not rent any of the remainder, and had no interest in it or control over it. Mr. Puryear permitted me to turn my work horses on it to graze, but the right to do this was not included in any contract we had as to my renting the house and garden. The fencing was not all done at once. From the time the first postholes were dug for the fence around the lines marked on the plat 'b,' 'c,' 'd,' 'e,' 'f,' and 'g,' until all the holes were dug and the posts set around these lines, was two or three months. It was then some time before the wire was strung up. My best recollection is the work was done in 1891, but am not sure. Before finally closing up the pasture we guarded it (the land) the best we could, by keeping other stock off. Of course others got on the land and so did the sheep-herders with their sheep. I have driven them off frequently. No one guarded of a night, and there was nothing to keep other stock off then. Puryear did not have any one to specially watch or guard the land. There were times of a day when none of us were watching or guarding.

"Chas. Wolf testified for defendant: I bought the land from Christopher and Buchannon Schmidt in 1883 and received from them the original patent, the original deed from Williamson to Wynne, and the original deed from Wynne to Frederick Schmidt, already introduced in evidence by defendant. I never heard of any claim adverse to the title I purchased under until Friery filed his first suit, in 1886. I have known defendant, Puryear, intimately since he bought the land from me, in 1884.

I was in general mercantile business in Austin, and saw him very frequently there. I know he began buying barbed wire there as early as 1888. He always came by my place of business and talked with me about his farm and what he was doing, and said he was buying wire to fence on this land."

"*Plaintiff's Rebuttal Evidence.*—J. H. McNutt testified: I am county surveyor of Hays County, and was in 1890. During that year I had occasion to run around the David G. Williamson 640-acre survey in controversy in this suit. I actually ran around the survey on the ground in person with my compass, and went along and over each of its boundary lines. There was then a little house on the land up very close to the north line, but there were no fence, posts, or postholes on or along any of the lines of the survey. This was in April, 1890, that I ran around the Williamson survey, as testified about.

"Cross-examined by defendant: I would not remember the date but for my book in which I kept the field notes of surveys as made. I have examined this book and know I am not mistaken. The exact day of April is not plain in my book, as I pasted since another little clipping over it, and on removing it, it leaves the date not plain; but, as you see, the month 'April' and the year '1890' are quite plain. There may have been some posts piled up on this land at the time, but I am quite sure no postholes had been dug nor posts set. Defendant had nothing to do with the surveying. I was surveying for Cal Roy."

This testimony shows without conflict that in 1887 appellant built a house and fenced in a garden on the land near its north line. As to the time when the other fencing was done there is a conflict between the testimony of appellant and his son-in-law, Sam Robinson, on the one hand, and that of the witness McNutt on the other. This conflict is to be resolved in favor of the judgment; hence we dispose of the case upon the theory, and find as a fact that no fencing or other improvement was placed upon the land by appellant except the house and garden until about two years before this suit was brought.

We rest our decision upon the undisputed fact that, more than three years before the suit was commenced, the defendant, by building the house, fencing the garden, placing a tenant in possession of the house and garden, and the use of the balance of the land by appellant and his tenant for grazing purposes—though such use is not shown to have been exclusive for the entire time—acquired such actual possession of part of the land embraced in his chain of title as drew to him the constructive possession of the entire survey.

Upon the subject of the landlord's possession of all the land embraced in his muniments of title when the only actual possession shown is that of a tenant leasing a portion of the land from him, the decisions in this State are in conflict and unsatisfactory.

It seems to have been held in Texas Land Company v. Williams, 51 Texas, 61; Read v. Allen, 63 Texas, 154, and Craig v. Cartwright, 65 Texas, 415, that when a party claiming land leases by a written contract

a specified part of it, describing it by metes and bounds, his possession through his lessee extends only to the parcel so defined. But these decisions were not followed in Bowles v. Brice, 66 Texas, 724—the latest case on the subject decided by our Supreme Court to which our attention has been called.

In that case, the present Chief Justice writing the opinion, it is said: "The facts proved in regard to the possession of the premises in controversy were substantially as follows: Mrs. Mize, the vendor of Z. P. Mize, was living upon the land in 1874, occupying a dwelling house and cultivating a farm of some twenty-five acres, which was all of the land then cleared, and so continued to occupy it until Ivey purchased it at the execution sale in March, 1876. Ivey then went into immediate possession, and rented it to tenants for cultivation, and continued so to hold it until he sold to Thorp, when Thorp took his place as landlord, the tenants continuing to occupy and cultivate the farm. In the fall of 1877, Thorp, being unable to pay for the land, agreed with Ivey to rescind the sale, when Ivey again took charge and collected the rents for the year. Thorp did not reconvey to him by deed until the spring of 1878. He, however, continued to hold the land by tenants, until he conveyed to W. T. and E. L. Brice, in 1880. After this, appellee, Hester A. Brice, the mother of W. T. and E. L. Brice (they being minors), continued to rent the land for them until the trial of the cause. During a part of this time Thorp, who was her son-in-law, supervised the renting of the property, acting for her and them. It was also proved, that during the time the land was rented by Ivey, and also during the time it was let after his sale to the Brices, the tenants occupied only the improved part, and had no authority or control over the balance. Ivey during his occupancy cleared some additional land, making in all some forty-five or fifty acres in cultivation. Ivey and Mrs. Hester A. Brice were the only witnesses who testified in the case, and in so far as they testified about the same facts, their testimony was in substance the same. The testimony as stated was uncontroverted. It was also proved that from the time of the sheriff's sale until the filing of the amended petition the taxes on the land had been regularly paid. * * The fourth assignment is, that the court erred in refusing a special instruction asked by appellant, to the effect that if the tenants through whom appellees and those under whom they claimed held possession and occupied only the cultivated land, and their lease included no part of the land but this, then possession of appellees extended only to the part of the premises so occupied; and that if they had not shown what particular part was so occupied, the jury would find for plaintiff. The question is, must the possession in this case be restricted to the portion of the premises actually occupied by the tenants? It is held in Read v. Allen, 63 Texas, 154, and in Texas Land Company v. Williams, 51 Texas, 61, that when a party claiming land leases by written contracts specific parts of it, describing them by metes and bounds, his possession through his lessees extends only to the parcels so defined. This is in accordance with the principle laid down in Cunningham v. Frandtzen, 26 Texas, 34, that

where one in possession of a tract of land sells the portion actually occupied by him, his constructive possession which before existed as to the remainder immediately determines. But we consider that we have a different case before us. Shall a party who lets to tenants for the purpose of cultivation the improved part of a tract of land be deemed to have lost his constructive possession of the portion which is unimproved? We think not. He applies the property to the only use of which it is susceptible, and should be deemed as exercising ownership over the whole tract as fully as if he were in possession of the improved portion, cultivating it himself. It is true that the witnesses state that the tenants in this case had no right or authority over the land not in cultivation. This is ordinarily the case in the farming out of agricultural lands. A tenant who leases of one claiming a house and lot in a city, a room in such house, does not usually have any dominion over other parts of the property, though unoccupied. Yet is it to be held that the landlord's possession is restricted to the room so leased? This question must be answered in the negative. No arbitrary rule can be laid down in this class of cases; and we conclude that in a case like the present, the possession of the landlord should be construed to be coextensive with the boundaries of his deed."

We are unable to discover any difference in principle between Bowles v. Brice and the case at the bar. It is true, in the former case there was much more land in cultivation than in this case; but what proportion the land leased to the tenant bore to the entire tract is not disclosed by the report in the case. In one respect the cases differ, but the difference is in favor of the appellant in this case. In Bowles v. Brice it was shown that the tenants occupied only the improved part, and had no authority or control over the balance. In this case, while it is true that the tenant only rented the house and garden spot, and stated that he had no control over the remainder, his uncontroverted evidence shows that appellant allowed him to use the unoccupied land for pasturage purposes—in other words, to keep his horses, together with appellant's, upon the land. And it also appears, with reasonable certainty, that grazing live stock was the only use to which the land, in its then condition, was adapted. This possession and use by the tenant, together with use by appellant of the unimproved land for grazing purposes, continued from 1887 up to and after the time the fences were built which inclosed the tract of land in controversy, together with part of another tract occupied by appellant, except the space between the fields (B) and (C), and the lane between the fields (A) and (B), as shown in the above sketch. It seems, therefore, from the very beginning of the tenant's occupancy of the house—the use to which it was adapted—there was a partial and incidental use by him of the remainder of the land in a manner appropriate and subservient to his occupancy. Hence this case has stronger testimony to support the plea of limitation than did the case of Bowles v. Brice.

Speaking for himself alone, and not intending to commit the other

members of the court, the writer is of the opinion that upon the subject of limitation there should be no distinction between actual possession held by a tenant and such possession held in person or by an agent. While, as between landlord and tenant, the tenant has the right of possession during the term of his lease, yet, in so far as the question of fee simple title and the rights of third persons are concerned, the tenant holds under and as the representative of the landlord. Therefore, his possession is the possession of the landlord; and if this were not true, the landlord could not sustain his plea of limitation, even as to the premises rented to and actually occupied by the tenant. In my opinion, the alleged analogy between the possession of a vendee and that of a tenant holding under a written lease restricting his possession to less than the entire land does not in fact exist. The possession of the vendee who has bought and paid for the land is adverse to the right of his vendor. The vendor, having conveyed—or attempted to convey—to his vendee the fee simple title, can not claim that the vendee is holding possession in subordination to his superior right to the land and its possession at the expiration of a specified time.

The case of Cunningham v. Frandtzen, 26 Texas, 34—cited in Read v. Allen, 63 Texas, 154, and Bowles v. Brice, supra, as authority for the proposition, that the possession of a tenant holding under a written lease restricting his possession to less than the entire tract of land owned by the landlord is not equivalent to like possession held by the landlord in person or by agent—does not, in the writer's opinion, support any such conclusion.

In that case it is said by Roberts, J.: "The appellant asked the court to charge the jury that 'a party claiming a tract of land, and placing a tenant in possession of the same upon improvements, afterwards sells a portion of the tract, including the improvements, to the tenant, who remains in possession of the tract sold, ceases to be the tenant in possession of the remainder, and it is in law a voluntary abandonment of possession of the balance of the tract by the claimant; and it matters not whether that abandonment be for a day or for years, the statute ceases to run in his favor.' This charge was refused by the court, and its refusal is assigned as error. It was pertinent to the facts in proof; and in reference to the facts it could not have misled the jury, whether or not in every state of facts it might be literally correct. Some such charge was necessary, as that must have been the turning point in the case, and none was given. It is well settled that a party in possession, with improvements and inclosure, holds to the extent of his inclosure by what is termed actual possession; and if at the same time he holds under deed or title, he holds to the extent of the boundaries of his deed or title, outside of his actual possession, by what is termed constructive possession. The constructive is dependent upon the actual possession, and must continue or fail with it. If such a party sell a part of his tract, including the improvements, which constituted his actual possession, by a deed to a purchaser, with defined limits less than the whole tract, and the purchaser take pos-

session under his deed, his possession, either actual or constructive, extends no further than his deed, and therefore he, the purchaser, is himself not in possession of the whole tract of his vendor. And the vendor, having parted with that which gave him actual possession of part, loses the constructive possession of the balance, he not taking actual possession of any other part at the same time."

The doctrine announced in this quotation is undoubtedly correct, because, as there stated by the charge approved by the Supreme Court, the tenant who purchases from his landlord the land occupied by him as tenant ceases to be a tenant, and thereafter his possession is not the possession of his former landlord; and the doctrine there announced is predicated upon that very fact.

Our conclusion is—and we find as matters of fact and law, from the uncontroverted testimony in the record—that by and through the occupancy and use of the house and garden on the land by his tenant, Sam Robinson, and by the partial use of the remainder by the defendant and said tenant for grazing purposes, for more than three years before the commencement of this suit, and continuously thereafter, such continuous adverse possession was shown as will support the plea of three years limitation. And, such being the case, appellant's motion for a rehearing will be granted, the judgment heretofore rendered by this court set aside, the judgment of the District Court reversed, and judgment here rendered that appellee, plaintiff in the court below, take nothing by his suit, and pay all costs of both courts.

*Rehearing granted.*
*Reversed and rendered.*